898 A.2d 465

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES

v.

## Diane MYERS, et al.

## No. 51, Sept. Term, 2005.

Court of Appeals of Maryland.

May 9, 2006.

Michele J. McDonald, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Judith Barr, Asst. Atty. Gen., on brief), for petitioner/cross-respondent.

Hillary Galloway Davis (Davis & Associates Law Office, P.A., Towson, on brief), for respondents/cross-petitioners.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The final administrative authority under the statutory grievance procedure for most State Executive Branch employees is an administrative law judge (ALJ) from the Office of Administrative Hearings (OAH). The principal question before us is whether, in a grievance based on the alleged placement of an employee into an inappropriate classification, the ALJ has authority, if he or she concludes that the employee is performing duties that entitle the employee to be in a different classification, to direct that the employee be placed into the proper classification. We agree with the ALJ in this case and with the Court of Special Appeals that the ALJ does have that authority.

## BACKGROUND

In 1996, the General Assembly made a number of substantial changes to the State personnel law and the State Personnel Management System (SPMS), which includes all positions in the Executive Branch of the State Government not specifically excepted. The issue before us involves two major aspects of the SPMS—the procedure for classifying positions included within it and the grievance mechanism that allows employees to complain about whether they are in the proper classification.

The SPMS comprises six categories of employees—those in the skilled service, the professional service, the management service, the executive service, special appointees, and temporary employees. *See* Maryland Code §§ 6–401 through 6–406

of the State Personnel and Pension Article (SPP). All employees not in one of the other categories are in the skilled service. Basic administration of the SPMS is vested in the Secretary of Budget and Management (Secretary).

The SPMS is based largely on classes of positions, the development of which is essentially a joint effort between the heads of the principal units of the Executive Branch and the Secretary. The process is set forth in SPP §§ 4–201 through 4–205. Section 4–201 gives the Secretary the authority (1) to establish classes, (2) to assign a rate of pay to each class, (3) to ensure that each class comprises one or more positions that are similar in their duties and responsibilities, similar in the general qualifications required to perform those duties and responsibilities, and to which the same standards and tests of fitness and the same rates of pay can be applied, (4) to give each class a descriptive classification title, (5) to prepare a description of each class, and (6) to create additional classes and abolish, combine, or modify existing ones. Section 4–202 directs the Secretary to establish standards and general procedures for classifying positions in the skilled and other services.

The actual classification plans for the various units in the Executive Branch are prepared by the heads of the units and submitted for the Secretary's approval. SPP § 4–203. Once the plan is approved, the unit head is directed to classify positions in accordance with the plan, and each employee in a position assumes the classification title given to the class to which that position belongs. To assure that positions are classified properly, the Secretary is directed, at least once every three years, to conduct position classification audits and operational audits of classification practices and records. *Id.* Section 4–204 authorizes the Secretary to classify positions in a unit when necessary to preserve the integrity of the classification system and to order the head of a principal unit to take action to properly classify a position or to comply with a classification audit.

The grievance procedure for SPMS employees is set forth in title 12 of SPP. The term "grievance" is defined in § 12–101(c) as a dispute between an employee and the employer about the interpretation, and application to the employee, of a personnel policy or regulation adopted by the Secretary or any other policy or regulation over which management has control. It does not include, however, a dispute about (1) a pay grade or range for a class, (2) the amount or effective date of a statewide pay increase, (3) the establishment of a class, (4) the assignment of a class to a service category, (5) the establishment of classification standards, or (6) an oral reprimand or counseling. Unless another procedure is provided by SPP, the grievance procedure is the exclusive remedy through which a non-temporary employee in the SPMS may seek an administrative remedy for a violation of SPP § 12–103.

With an exception not relevant here, there are three steps (and one pre-step) to the grievance procedure. The pre-step, set forth in § 12–202, is informal discussion between the employee and his or her immediate supervisor. The first formal step (§ 12–203) is initiation of the procedure by filing a grievance with the employee's appointing authority. The second step (§ 12–204) is an appeal from the appointing authority's decision to the head of the grievant's principal unit, and the third step, which has several phases to it, is an appeal to the Secretary of Budget and Management (§ 12–205). If the Secretary is unable to resolve the grievance through a settlement, the grievance must be referred to OAH for a hearing and decision by an ALJ. The decision of the ALJ is the final administrative decision. § 12–205(c)(2)(ii).

This case involves seven employees working at various correctional institutions in the Department of Public Safety and Correctional Services (DPSCS)—Diane Myers, Beverly Smith, Jane Dryden, Tracey Lunkin, Behira Said, Kevin Hunt, and Debbie Carty—each of whom is involved in procurement for the Department. Prior to 1999, DPSCS used the unitary "Agency Buyer" classification series for all of its procurement positions. Smith was an Agency Buyer I, Grade 10; Myers, Hunt, and Lunkin were each an Agency Buyer V, Grade 14;

and Carty, Dryden, and Said were each an Agency Buyer IV, Grade 13. Other State agencies had two classification series for procurement personnel, one of which included positions with a higher level of complexity.

In 1999, as the result of a classification study, the Secretary created a second classification series for procurement personnel in DPSCS—the "Agency Procurement Specialist" (APS) series. The APS series was intended for employees who purchased items using the competitive bidding or negotiation process. The APS II classification is for "the full performance level of work in the procurement of equipment, services, construction, supplies, information technology, and other needs, which must be obtained through the competitive or negotiated procurement process." Persons in that classification do not supervise other APS personnel but may supervise or give guidance to agency procurement associates and support staff. The APS Supervisor classification is for "the supervisory work" in that kind of procurement; employees in that class supervise APS employees and paraprofessional staff.

In January, 2001, after creation of this new classification series, DPSCS requested clarification from the Department of Budget and Management (DBM) regarding the distinction between the Agency Buyer and the new APS series, noting that there seemed to be some confusion regarding the purpose of the APS series, in particular whether it was intended to replace the Agency Buyer series. The confusion, DPSCS said, "is compounded by the fact that the job specifications reference similar areas of responsibility." In March, 2001, a classification analyst for DBM responded by noting that (1) the APS series was designed to recognize work related to the competitive or negotiated procurement process and that employees in those positions are responsible "for the entire procurement process," and (2) agency buyers "are not responsible for procurements made through the competitive or negotiated process" and "do not determine the most appropriate procurement methods to use in accordance with COMAR Title 21." Only certain types of procurement were delegated to the

correctional institutions, and the agency buyers apply the State procurement regulations "only to those types of procurement delegated to their institutions." The letter stated that the APS series was not designed to replace the agency buyer series in its entirety but that DBM planned to review the agency buyer series to determine if the specifications accurately addressed the work performed.

Following that response, DBM examined the 23 positions in DPSCS that were involved with procurement activities and, on May 31, 2001, issued a report with respect to those positions. One person in each of the correctional institutions was identified as the procurement officer, and that person was recommended for reclassification as an APS II (grade 15). One person in the office of the Secretary of DPSCS was found to meet the criteria for DPS Supervisor (grade 17). As a result of these evaluations, the seven employees who are parties to this case were dealt with as follows:

(1) Ms. Myers was found to function as the procurement officer for the three consolidated DPSCS institutions in the Jessup area and to supervise two Agency Buyer II positions; she was reclassified from Agency Buyer V (grade 14) to APS II (grade 15);

(2) Ms. Smith was found to be "an assistant to the Procurement Officer" at one institution and was reclassified from Agency Buyer I (grade 10) to Agency Buyer V (grade 14);

(3) Ms. Dryden was found to function as the procurement officer for one institution and to supervise two agency buyers; she was reclassified from Agency Buyer IV (grade 13) to APS II (grade 15);

(4) Ms. Lunkin was found to function as the procurement officer for the Division of Pretrial Detention and Services and to supervise one Agency Buyer II position; she was reclassified from Agency Buyer V (grade 14) to APS II (grade 15);

(5) Ms. Said was found to function as the procurement officer for one institution and to supervise one Agency Buyer I

and a fiscal clerk. She was reclassified from Agency Buyer IV (grade 13) to APS II (grade 15);

(6) Mr. Hunt was found to function as the procurement officer for a pre-release center and to supervise one Agency Buyer. He was reclassified from Agency Buyer V (grade 14) to APS II (grade 15);

(7) Ms. Carty was found to function as the procurement officer for maintenance contracts, supplies, equipment, and services for the three institutions at the Hagerstown complex and to supervise three Agency Buyer I positions. She was reclassified from Agency Buyer I (grade 13) to APS II (grade 15).

None of these employees were entirely happy with those reclassifications, and, in September, 2001, they each filed a grievance seeking a further reclassification. Ms. Smith contended that her duties were at last equal to APS II and sought reclassification to that position, retroactive to December 1, 1999. The other employees, in a joint grievance, averred that their duties were at least equal to APS Supervisor, and they sought reclassification to that position, retroactive to December 1, 1999. The grievances proceeded through the three steps noted. When, at step three, the parties failed to reach agreement, the Secretary's designee, in conformance with SPP § 12–205(b)(2)(ii), referred the grievances to OAH.

After an evidentiary hearing, the ALJ, on May 22, 2003, filed a memorandum and order in which he granted the grievances filed by Ms. Myers and Ms. Smith but denied the others. He concluded from the evidence that Ms. Smith's responsibilities dealt primarily with the competitive or negotiated procurement process and that she performed the kind of work set forth in the specifications for the APS II position. Accordingly, the ALJ found that management erred in retaining her in the Agency Buyer classification and not placing her in the APS series, and he ordered that she should be reclassified to APS II. He noted that SPP § 12–402(b)(2) provided that, in a reclassification grievance back pay may be awarded for a period not exceeding one year before initiation of the

grievance procedure, that Ms. Smith had initiated the grievance on September 11, 2001, and that she had been performing the duties of APS II for at least a year prior to that date. He therefore determined that she was entitled to back pay commencing September 11, 2000.

Ms. Myers, the ALJ concluded, was placed in an APS II position, rather than an APS Supervisor, because DBM had determined that she did not supervise an APS employee, which is a prerequisite for the APS Supervisor position. One of the persons she supervised was Ms. Smith. As the ALJ found that Ms. Smith was entitled to be reclassified, retroactively, to APS II, it was clear that Ms. Myers *did*, indeed supervise an APS II employee, and, accordingly, she was therefore entitled to be reclassified, retroactively, to APS Supervisor.

As to the five other grievants, seeking to become APS Supervisors, the ALJ iterated his conclusion that, in order to sustain their grievances, they had the burden of establishing in the contested case proceeding that they, in fact, supervised APS employees, and he concluded that they had failed to offer proof that they did so. For that reason—failure to sustain their respective burdens of proof—he denied the grievances.

DPSCS filed a petition in the Circuit Court for Baltimore County for judicial review of the ALJ's decision to reclassify Ms. Smith and Ms. Myers. The other five grievants filed a cross-petition seeking review of the denial of relief to them. The Department made two arguments—that the ALJ erred in finding that Smith and Myers were improperly classified by DBM and that, even if he did not err in that regard, he had no authority to reclassify those employees—that only DBM had authority to reclassify employees and that the ALJ's only authority was to award back pay.

The court found no error in the ALJ's determination that Smith and Myers were entitled to reclassification but concluded that he had exceeded the scope of his authority by actually ordering the reclassification. As to those employees, the court therefore directed the ALJ to modify his order and remand

the cases of Smith and Myers to DBM for restudy. The court affirmed the ALJ's decision as to the other five employees, noting that the employees that they apparently supervised were still classified as Agency Buyers and had not filed grievances to be reclassified to APS status.

The seven employees noted an appeal to the Court of Special Appeals, which essentially affirmed what the ALJ had done. *Myers v. Dept. of Public Safety,* 162 Md.App. 272, 873 A.2d 1225 (2005). The intermediate appellate court held that the ALJ did not exceed his authority in ordering that Smith and Myers be reclassified, and it reversed the judgment of the Circuit Court on that point, but it affirmed the Circuit Court ruling that the ALJ did not err in declining to reclassify the other five employees. We granted *certiorari* to consider both of those issues, and we shall affirm the judgment of the Court of Special Appeals.

## *DISCUSSION*

### *Smith and Myers*

DPSCS is no longer contesting the ALJ's factual determinations bearing on whether Smith was performing duties assigned to the APS II position or that, as a result, Myers was performing duties assigned to the APS Supervisor position. Its only point now is that, at least in the absence of finding some defect in DBM's reclassification procedure, the ALJ had no authority to direct the reclassifications. Its view seems to be that the ALJ should either have denied the grievances or, at most, directed a restudy of the grievants' situations by DPSCS in consultation with DBM. We disagree.

As we have observed, "grievance" is defined very broadly. With only those exceptions enumerated in SPP § 12–101(c)(2), the term includes any dispute between an employee and the State agency about the interpretation of and application to the employee of a personnel policy or regulation adopted by the Secretary or any other policy or regulation over which management has control. *See* SPP § 12–101(c)(1). The only kinds of disputes excluded from that definition are disputes

over (1) a pay grade or range for a class, (2) the amount or effective date of a statewide pay increase, (3) the establishment of a class, (4) the assignment of a class to a service category, (5) the establishment of classification standards, and (6) an oral reprimand or counseling.

There is nothing in the definition remotely suggesting that a dispute over whether an employee is performing duties that have been assigned to a different position and, for that reason, is entitled to be reclassified to the position to which those duties have been assigned, is excluded from the grievance procedure, and, indeed, both the statute and the regulations promulgated by DBM expressly recognize that kind of reclassification grievance. SPP § 7–102(e) requires that the duties and responsibilities assigned to a position shall be consistent with the duties and responsibilities for the position's assigned class and provides that "[a]n employee may grieve the assignment of duties and responsibilities . . . if those assigned duties and responsibilities clearly are applicable to a different class." That was precisely the nature of Smith's and Myers's grievances.

The regulations adopted by DBM expressly reference SPP § 7–102. COMAR 17.04.02.01B states that a grievance "involving a position reclassification" is governed by SPP §§ 7–102(e), 12–101(b)(2), 12–205, and COMAR 17.04.06.05. That latter regulation requires that, if a grievance "is based on a position's classification," the head of the principal unit must assure that a classification study of the employee's position was made within a year prior to the initiation of the grievance. That was done in this case. The DBM study that led to the grievances was completed May 31, 2001, and the grievances were filed in September, 2001.

Unquestionably, an employee may use the grievance procedure to complain that the employee's duties and responsibilities are those assigned to a different classification. Indeed, as we observed, SPP § 12–103(b) provides that, unless another procedure is provided by SPP, the grievance procedure "is the exclusive remedy through which a nontemporary employee in

the [SPMS] may seek an administrative remedy for violations of the provisions of this article."

The administrative procedure ends with the decision of an ALJ, who is the final decision maker.[1] SPP § 12–401 provides that the decision maker at any step in the grievance procedure shall determine not only the "proper interpretation or application of the policy, procedure, or regulation involved in the grievance" but also the "appropriate remedy." It would seem virtually axiomatic that, if the final decision maker—the ALJ—determines, as he did here, that the employee's duties and responsibilities are those assigned to another classification, the principal remedy would have to be either to strip those duties or responsibilities from the employee or direct a reclassification of the employee to the position to which those duties and responsibilities are assigned. Otherwise, the grievance procedure would be a farce. SPP § 12–402 makes that authority clear. Section 12–402(a) provides that, except as provided in subsection (b), dealing with back pay orders, "the remedies available to a grievant under this title are limited to the restoration of the rights, pay, status, or benefits that the grievant otherwise would have had if the contested policy, procedure, or regulation had been applied appropriately as determined by the final decision maker." Restoration of such "rights, pay, status, or benefits" may well require a reclassification; otherwise, the rights, pay, status, and benefits awarded to the successful grievant would be incompatible with the employee's position and thus incompatible with SPP § 4–201.

Section 12–402(b) supports that principle. It provides, in relevant part, that "[i]n a reclassification grievance back pay may be awarded for a period not exceeding 1 year before the

1. Because that is so clear from the statute itself, it is not necessary to resort to extrinsic evidence to establish the legislative intent. We do note that, prior to the rewriting of the personnel law in 1996, the State Department of Personnel was the final decision maker with respect to grievances and that one of the key and deliberate changes effected by the 1996 legislation was to do away with that Department, place much of the authority formerly exercised by it with DBM, but to make the independent ALJ, rather than DBM, the final decision maker with respect to grievances.

grievance procedure was initiated." The back pay necessarily must reflect the additional compensation attached to the position that the employee should have had if "the contested policy, procedure, or regulation had been applied appropriately as determined by the final decision maker." *See* § 12–402(a).

We do not share DPSCS's view that allowing the ALJ, as the final decision maker in a grievance proceeding, to direct an appropriate reclassification will significantly impinge upon the jurisdiction and responsibility of either the principal unit or DBM in devising or implementing the classification system; nor will it jeopardize the integrity of the SPMS. The ALJ is not changing the definition or description of classes or positions but is simply determining, based on the facts presented, that a particular employee is executing duties and responsibilities that those agencies have assigned to a different position and that the employee is therefore entitled to be in that position.

### *The Other Grievants*

The argument made by the other five grievants—Dryden, Lunkin, Said, Hunt, and Carty—is that they were performing the same duties as Myers and were supervising employees who, though placed in the Agency Buyer series, properly should have been reclassified to the APS series. The problem was that those employees had not sought reclassification and therefore remained in the Agency Buyer positions. As a result, Dryden, Lunkin, Said, Hunt, and Carty did not supervise any APS employees and, for that reason, were not entitled to be in an APS Supervisor position. We agree with the Court of Special Appeals that the ALJ committed no error in that conclusion or in denying the five grievances.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**